**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ATARI INTERACTIVE, INC.,<br><br>     Plaintiff,<br><br>v.<br><br>PRINTIFY, INC., JANIS BERDIGANS, and<br>JOHN DOES 1–10,<br><br>     Defendants. | Civil Action No. _____<br><br><u>**COMPLAINT**</u><br><br><br>**JURY TRIAL REQUESTED** |

Plaintiff Atari Interactive, Inc. (" Atari") files this Complaint against Printify, Inc. ("Printify"), Janis Berdigans ("Berdigans" or "Printify's Founder"), and John Does 1–10[1] (collectively, "Defendants"), and in support states as follows:

<u>**INTRODUCTION**</u>

1.　　Atari brings this action against Defendants to stop the widespread and ongoing manufacturing, advertising for sale and sale of counterfeit Atari products and the infringement of Atari's intellectual property rights, by and involving Defendants, and to obtain an accounting and other relief based on Defendants' unlawful conduct and corresponding financial gain.

2.　　Atari tried without success to put a stop to this unlawful conduct. Through counsel, Atari sent seventy cease and desist letters seeking to stop the misappropriation and unauthorized use of Atari's intellectual property rights by Defendants in connection with their manufacture and sale of counterfeit and infringing products (the "Counterfeit and Infringing Products"). Despite those efforts,

---

[1] Atari believes that other individuals, whose identities have not yet been discovered, are also liable as joint tortfeasors with the named defendants. Their identities will be the subject of discovery as this case proceeds.

Defendants' unlawful conduct continues, with new Counterfeit and Infringing Products popping up for sale on a regular basis.

3.      Defendants unlawfully profit from the proliferation of online counterfeiting, which has become a global threat to intellectual property rights.  Abandoning localized brick-and-mortar storefronts, and enabled by companies like Printify and people like Mr. Berdigans, counterfeiters have turned to the internet to exploit its expansive reach and the high level of anonymity it offers.

4.      Defendants play a key role in the increasing sale of counterfeit goods, leveraging a massive online presence comprising of at least 8 million Printify merchants[2] to create and distribute counterfeit and infringing and goods in this District and across the country while disguising Printify as a legitimate and compliant print on demand ("POD") company.

5.      Having fulfilled over 21 million orders since 2015, with sales of over $500 million, mostly in the United States, and with an ever-increasing network of merchants growing by the millions year on year, thereby allowing for the sales of counterfeit goods to follow the same upwards trajectory, Defendants' continuous expansion represents the most formidable threat to the preservation of intellectual property rights.

6.      To increase their sales of counterfeit and infringing products, Defendants are involved with and promote the creation of numerous "stores" for these sales, disguised as storefronts for purported third-party Printify merchants that "connect" their domain names and other e-commerce accounts directly to Printify, where digitized counterfeit and infringing products held in Printify's database are then published online by Printify (the "Defendants' Online Storefronts").

7.      Defendants' Online Storefronts and the Counterfeit and Infringing Products sold

---

[2] *See* https://www.linkedin.com/company/printify ("We've made it possible for 8 million people to find their freedom selling high-quality products online, risk free.").

through them are actually under Defendants' control: Defendants exercise significant control over the manufacturing, printing, shipping, customer service, and all other logistical and fulfillment requirements in the creation and distribution of counterfeit and infringing products. Indeed, Defendants, not any third-party merchant, have complete control over the ability to publish products online on Defendants' Online Storefronts—the very critical and initial action in the cycle of counterfeit and infringing products entering into the stream of commerce.

8.     Based on Atari's investigation to date, Defendants' focus appears to be on creating the false impression of legality, while actively concealing their illegal activities and seeking to prevent and obstruct enforcement efforts. For example:

a.     Counterfeit and Infringing Products purchased from Defendants' Online Storefronts are delivered in packaging labeled with default Printify return addresses, but those addresses mostly appear to be virtual addresses or private citizen's residences that have nothing to do with the sale, and when viewing the tracking history of the packages, the packages do not originate from anywhere near the listed "default" return addresses.

b.     Emails that appear to be sent from Defendants' Online Storefronts are sent to purchasers of Counterfeit and Infringing Products with tracking details, but upon closer examination, those emails are not actually sent from any publicly facing e-mail address displayed on Defendants' Online Storefronts, but rather, they are sent from a hidden email address "via Printify.com."

c.     Defendants associate themselves with a San Francisco address in their

promotional materials,[3] including emails, but Defendants in fact stopped using that address years ago, and their headquarters is not in the United States but rather Riga, Latvia. In fact, all but a miniscule number of Defendants' employees and various contractors are located in Europe, mainly in Latvia and Estonia.

d.   Printify has directed merchants to report to Printify's support team for investigation any instances where "Printify" appears on the product packaging, as Printify conceals its involvement in the transaction and does not approve any reference to Printify on packaging or labeling.

e.   Defendants represent that Printify will remove any listings that contain infringing content in the title descriptions for products published and advertised on Defendants' Online Storefronts, but Printify does not actually do that. Defendants instead continue to push the sales of those listings in exchange for a profit.

f.   If any third party has managed to uncover that Defendants are in fact the controlling force behind the Counterfeit and Infringing Products on Defendants' Online Storefronts, they will have difficulty reporting those instances of intellectual property infringement. Defendants have imposed obstacles that impede access to reporting, and for those who somehow manage to locate Printify's reporting mechanism, Printify's reporting form then expressly discourages such reporting, in particular trademark infringement.

---

[3] *Printify vs CustomCat*, Printify, https://printify.com/printify-vs-customcat/ ("Printify is the world's most famous print-on-demand platform HQ'd in San Francisco, USA, founded in 2015").

9.     Atari's global brand has found itself in the crosshairs of Defendants' counterfeiting operations.   Despite the seventy cease and desist letters sent to Defendants' Online Storefronts, Defendants' conduct continues unabated, and the manufacture, publishing, advertising for sale and sales of Counterfeit and Infringing Products persists.   Atari brings this action to put a stop to this ongoing unlawful conduct and to hold Defendants accountable for their actions.

10.     Defendants trade upon Atari's reputation and goodwill by selling and/or offering to sell products in connection with both a portion of Atari's trademarks, which are covered by U.S. Trademark Registration Nos. 4,214,210, 1,280,537, and 1,280,536 (collectively, the "Atari Trademarks" or "Atari Marks"), and Atari's copyright works, in particular U.S. Copyright Office Registration No. VA0000162740 (the "Bentley Bear Copyright").   The registrations are valid, subsisting, and in full force and effect.   True and correct copies of the federal trademark registration certificates for the Atari Trademarks are attached as **Exhibit 1**.   A true and correct copy of the federal copyright registration certificate for the Bentley Bear Copyright is attached as **Exhibit 2**.

11.     Defendants' unlawful conduct cannot persist without consequence.

## THE PARTIES

12.     Plaintiff Atari is a Delaware corporation with its principal place of business in New York, New York.

13.     Defendant Printify is a Delaware corporation with its principal place of business in Riga, Latvia.

14.     Upon information and belief, Defendant Janis Berdigans is an adult domiciled in Latvia.

15.     Upon information and belief, John Does are individuals who are consciously participating in the manufacture, distribution, sale, and advertisement of Counterfeit and Infringing Products, or who consciously and directly benefit financially from the manufacture, distribution, sale,

and advertisement of Counterfeit and Infringing Products, but whose identity and number are presently unknown.

## JURISDICTION AND VENUE

16.     This Court has federal subject matter jurisdiction over the claims asserted in this action pursuant to 28 U.S.C. §§ 1331 and 1338 because this action arises under the federal Copyright Act and Lanham Act.  *See* 17 U.S.C. §§ 1101, *et seq.*; 15 U.S.C. §§ 1051, *et seq.*, as well as pursuant to 15 U.S.C. § 1121 as an action arising out of violations of the Lanham Act, 15 U.S.C. §§ 1051 *et seq.* Because the parties are citizens of different States and the matter in controversy exceeds, exclusive of interests and costs, the sum of seventy-five thousand dollars, this Court also has jurisdiction under 28 U.S.C. § 1332.   Jurisdiction over the state law claim is also appropriate under 28 U.S.C. § 1367(a) and principles of pendent jurisdiction because that claim is substantially related to the federal claims.

17.     Venue is proper pursuant to 28 U.S.C. § 1391 because Defendants conduct business in this District and, on information and belief, a substantial part of the events or omissions giving rise to the claims occurred in this District and has caused damage to Atari in this District.

18.     Personal jurisdiction exists over Defendants because Defendants regularly conduct, transact and/or solicit business in New York and in this District, supply their goods (including the Counterfeit and Infringing Products) and services to consumers in New York and in this District, derive substantial revenue from their business transactions in New York and in this District, and/or otherwise avail themselves of the privileges and protections of the laws of the State of New York, such that this Court's assertion of jurisdiction over Defendants does not offend traditional notions of fair play and substantial justice.

## FACTUAL ALLEGATIONS

### I.     Atari's Iconic Intellectual Property Portfolio and Products

19.     Atari's intellectual property portfolio subsists in relation to a dynamic collection of

vintage gaming software, arcade games, accessories, apparel, and other merchandise.  Created in 1972, the Atari brand quickly became a dominant force in the video game and arcade industry through the groundbreaking developments and legendary game releases made under its brand by Atari's predecessor company, Atari Inc.  Atari and its successors have pushed the boundaries of game design, captivating wide audiences with its arcade games, such as Pong and Crystal Castles, and its home video consoles, such as the Atari 2600 console.

20.     Years of promotion and consistently strong sales performance garnered Atari global brand recognition.  For example, Atari's famous logo, often referred to as the "Fuji" logo (shown in the chart below), is recognized worldwide, even to those outside the gaming world.

21.     Atari is the registered owner of the following trademarks, duly and legally issued by the United States Patent and Trademark Office. *See* Exhibit 1.

| U.S. TM Reg. No. | Trademark | Registration Date | Relevant Class |
|---|---|---|---|
| 1,280,537 | **ATARI** | June 5, 1984 | IC 025. US 022 039. G&S: Men's, Women's and Children's wearing apparel – namely, vests, T-shirts, jackets, caps, bibs, shirts, jogging suits and athletic jerseys. |
| 1,280,536 |  | June 5, 1984 | IC 025. US 022 039. G&S: Men's, Women's and Children's wearing apparel – namely, vests, T-shirts, jackets, caps, bibs, shirts, jogging suits and athletic jerseys. |
| 4,214,210 |  | Sept. 25, 2012 | IC 025. US 022 039. G&S: Articles of clothing, namely, T-Shirts, sweat shirts, hats. IC 016. US 002 005 022 023 029 037 038 050. G&S: Printed matter, namely posters, stickers; user and instruction manuals for computer hardware and software. |

22.     Atari has an active licensing business through which Atari has extended its brand into other media, merchandising, and publishing categories.  Atari creates and sells merchandise, such as clothing and other accessories, incorporating its trademarks and various artistic copyright works, including its federally registered Atari Trademarks and Bentley Bear Copyright (the "Atari Products"). From the date of the creation of the first Atari Products to the present, either Atari or its predecessor has been the sole and official source of genuine Atari Products in the United States.  Atari Products are distributed and sold to consumers throughout the world, including in the United States and New York through authorized retailers, various affiliates, and the www.atari.com website.

23.     Since at least 1977, the '536 and '537 Atari trademarks have been substantially and continuously marketed and promoted by either Atari or its predecessor company, and the same has been done in respect of the '210 Atari trademark since at least 2001.  Atari has and continues to widely market and promote Atari Trademarks through the Atari Products in the industry and to consumers.

24.     The registrations for the Atari Trademarks are prima facie evidence of their validity and of Atari's exclusive right to use that trademark under 15 U.S.C. § 1057(b).

25.     The Atari Trademarks qualify as famous marks, as that term is used in 15 U.S.C. §1125(c)(1), and they have been continuously used and never abandoned. Since the launch of the Atari Products, Atari and during an earlier period, a predecessor company, have followed a defined strategy for positioning its brand, marketing, and promoting the product line in the industry and to consumers, and establishing distribution channels.  Atari's promotional efforts for the Atari Products include, for example, the atari.com website, online advertising, social media advertising campaigns, and participation in annual game conventions.

26.     Atari approves and maintains quality control over all Atari Products and makes systemic efforts to safeguard the quality and integrity of the Atari Trademarks.  Atari has also expended substantial time, money, and other resources in advertising and otherwise promoting the Atari Products.

As a result, products bearing the Atari Trademark are widely recognized and exclusively associated by consumers, the public, and the trade as being products sourced from Atari.

27.    In addition, Atari is the owner of several artistic copyright works, both registered and unregistered, including the Bentley Bear Copyright. *See* Exhibit 2.



28.    Atari owns all exclusive rights, including the rights to reproduce the copyrighted works in copies, to prepare derivative works based upon the copyrighted works, and to distribute copies of the copyrighted works to the public by sale or other transfer of ownership, or by rental, lease, or lending, in its various copyright works and in particular, the Bentley Bear Copyright.

## II.    The Rapid Rise of Infringement and Counterfeiting in the POD Industry

29.    Print-on-demand or "POD" involves the creation ("printing") of products after an order is placed as opposed to in advance, keeping a stockpile of inventory.

30.    Advancements in printing technology and increasing purchasing capabilities have propelled the growth of the POD industry.

31.    One of the major risks with POD is, as in this case, the ease at which the manufacture and sale of counterfeit and infringing products can (and does) occur, as well as the speed at which the volume of those sales can increase, particularly in light of the ability to create such products, quite literally, "on-demand."

32.     Unsurprisingly, this has resulted in litigation.  For example, in 2018, a district court in the Eastern District of Wisconsin granted summary judgment (and then entered judgment) against POD company SunFrog for claims of direct and contributory infringement, including because SunFrog was directly involved with the sales and did "most of the legwork in the transaction" for the infringement.

33.     The success of the Atari Products has resulted in significant counterfeiting, and the rise in popularity of and ease of access to POD companies has only heightened the degree of Counterfeit and Infringing Products in the market.  While that fact is problematic itself, to make matters worse, Defendants take things a step further and set themselves apart from POD competitors by failing to implement safeguards to prevent or curb intellectual property infringement they are responsible for. Defendants instead simply seek to hide behind automated processes to improperly insulate themselves from liability.

## III.    Defendants' Expansive Infringement and Counterfeiting of the Atari Trademarks and Bentley Bear Copyright

34.     Started in 2015, Printify now claims to be the largest global print network with over $500 million in sales.

35.     Printify's growth has accelerated over the years, growing from 80 employees in 2019, to 300 by the end of 2020, to 500 in 2021, and with public statements announcing its plans to double to 1,000 by the end of 2022.

36.     Printify was valued at $300 million two years ago, and it is reportedly working towards becoming a multibillion-dollar company.

37.     Defendants take an active role in creating products, managing orders, and handling customer service, where (in Printify's own words) Printify will "do everything." For example, for setting up sales through Etsy, Printify instructs merchants to select the option regarding the production

process stating that Printify (the "partner") will "do everything."[4]  Once Printify publishes a product online on one of Defendants' Online Storefronts, "Printify handles the rest (quality control, reprints, refunds) without [the merchant] needing to do a thing."

38.     Printify's business includes partnerships with serial counterfeiters.  With its vast online reach of more than 8 million merchants, Printify is directly involved with and actively contributes to the proliferation of infringing and counterfeit goods in this District and throughout the United States.

39.     Defendants unlawfully manufacture, advertise, market and sell unauthorized and illegal products, including the Counterfeit and Infringing Products that misappropriate and use without any authorization Atari's Trademarks, by applying marks identical to the Atari Trademarks to goods in respect of which the Atari Trademarks are registered, as well as, in many instances, reproducing a substantial part of the Bentley Bear Copyright on those same goods, which causes further confusion and deception in the marketplace.

40.     For example, Defendants create and manufacture various types of Counterfeit and Infringing Products, including counterfeit Atari shirts, sweatshirts, long sleeve tees, and hoodies. Without Defendants, the Counterfeit and Infringing Products would not exist.  As discussed above, it is Defendants, and not any third-party merchant, that exercise control over the ability to publish products online on Defendants' Online Storefronts, including Counterfeit and Infringing Products.  That action is critical and is the initial step towards propelling counterfeit goods into the stream of commerce.  Only after a product is published is it possible for that product to then be purchased by an end-consumer, where Defendants take the baton again, as Printify proudly "handles the rest," all the way through to ensuring counterfeit products are delivered to consumers.  The extensive degree to which Defendants

---

[4] For example, to comply with Etsy's policies, Printify instructs merchants working with Printify to disclose to Etsy that Printify, not the seller, makes the products sold.  Printify then instructs merchants on how to "keep the full production partner details ***hidden from your customers***."

play a key role in creating and manufacturing the Counterfeit and Infringing Products and placing them into the market is discussed further below.

41.     Defendants actively seek to conceal their involvement.  Atari has identified numerous of Defendants' Online Storefronts connected to Printify to further the creation, manufacture, sale, offering for sale, and distribution of Counterfeit and Infringing Products to consumers in this District and throughout the United States.  Defendants hide their unlawful practices behind these storefronts, which purport to sell genuine Atari Products.

42.     On information and belief, Defendants' Online Storefronts include without limitation the storefronts identified in Schedule A to the Kavanaugh Declaration filed in support of Atari's motion for a temporary restraining order.

43.     Atari has discovered similarities among some of Defendants' Online Storefronts, such as the fact that many are owned by a Vietnamese company named "GMO-Z RUNSYSTEM" and hosted by a Japanese company named "GMO Internet Company.  Atari's investigation is ongoing in terms of these similarities and the various individuals and companies involved.

44.     Below are representative examples of Counterfeit and Infringing Products offered for sale through Defendants' Online Storefronts during 2023:



| Genuine Atari Products | Counterfeit and Infringing Products |
|---|---|





45. Atari has sent over seventy cease and desist letters demanding the removal of Counterfeit and Infringing Products from Defendants' Online Storefronts. Many of the identified listings have not been removed and are still offered for sale from Defendants' Online Storefronts.

46. The sale of Counterfeit and Infringing Products is ongoing. In fact, since sending the various letters, there seems to have been an increase in offers to sell Counterfeit and Infringing Products, with new or similar products appearing in Defendants' Online Storefronts.

47. Atari has not licensed or authorized Defendants or Defendants' Online Storefronts to use the Atari Trademarks or Bentley Bear Copyright, and neither Defendants nor Defendants' Online Storefronts are authorized retailers of the genuine Atari Products.

48. Defendants, without any authorization or license from Atari, have knowingly and willfully used and continue to use the Atari Trademarks and Bentley Bear Copyright in connection with the manufacture, advertisement, distribution, offering for sale, and sale of the Counterfeit and Infringing Products into the United States and New York over the Internet.

49. Defendants, directly and through Defendants' Online Storefronts, offer shipping to the United States, including New York (in this District) and, on information and belief, Defendants offered to sell and have sold counterfeit Atari products into the United States, including New York (in this

14

District), which is likely to cause and has caused confusion, mistake, and deception by and among consumers and is irreparably harming Atari.

**IV.   Defendants' Direct Involvement and Key Role in the Counterfeiting and Infringement of the Atari Trademarks and Bentley Bear Copyright**

50.    Printify is not a passive print shop.  Printify and Printify's Founder are directly involved as active participants in the creation and supply of Counterfeit and Infringing Products.  Among other actions taken by Defendants, and subject to further discovery regarding their direct involvement, Defendants: (1) provide trademarked and copyrighted content to their counterfeiting merchant partners in exchange for a fee, (2) exercise significant control over creation, manufacturing, printing, selling, shipping, customer service, and (3) engage in other tasks needed to bring the products into existence and into the market.

**A.   Defendants Supply and Use the Atari Trademarks and Bentley Bear Copyright**

51.    Defendants, through Printify's "partnership with Shutterstock," supply millions of images for use in the creation of products ("Printify Image Database").  Upon information and belief, Defendants control and maintain the Printify Image Database.

52.    Defendants falsely represent that "[a]ll available content [in the Printify Image Database] is licensable for commercial use."  But the Printify Image Database contains Atari intellectual property, including Atari trademarks, that is not licensable for commercial use, and Defendants induce merchants to infringe on that protected IP. For example:

  

*Images of Atari Marks supplied by Defendants for Infringement*

53.    Defendants profit from the use of these images, with Printify collecting a 17.5% fee for

each product containing the infringing Atari Trademarks sold to a consumer.

54.     In addition to supplying infringing content through the Printify Image Database, Defendants allow and arguably go so far as to encourage merchants to upload the Atari Trademarks and Benley Bear Copyright to create the Counterfeit and Infringing Products.  Recognizing the "very dangerous possibility" of "intellectual property theft," Defendants instruct merchants to make sure to slightly modify any "settled work" that Defendants will print on apparel—in other words, to walk the gray line with no clear instructions on what actions may lead them into infringement territory.

55.     Defendants' Online Storefronts have uploaded Atari Trademarks and Bentley Bear Copyright to Printify, with trivial modification (if any), and Defendants have used those images to manufacture the Counterfeit and Infringing Products.

### B.     Defendants Manufacture the Counterfeit and Infringing Products

56.     Defendants exercise control over the manufacture and creation of the Counterfeit and Infringing Products, including the selection of items to be manufactured and the process of arranging for the manufacturing.  Printify's default is to deploy its "Printify Choice" option, where Printify "automatically selects the most suitable Print Provider in [its] network, considering factors such as price, quality, and the location of [the] customer, while also ensuring maximum profitability for [the merchant's] business."  The details of the Print Provider selected by Printify are not even accessible by the merchant, further demonstrating Defendants' direct involvement and control.

57.     Printify has described the services it offers as those of a print provider in control of its own operations and services.[5]  In its 2015 Trademark/Service Mark Application submitted to the USPO

---

[5] Rule 201(b)(2) of the Federal Rules of Evidence permits federal courts to take judicial notice of "a fact that is not subject to reasonable dispute because it … can be accurately and readily determined from sources whose accuracy cannot be readily questioned."  Fed. R. Evid. 201(b)(2).  Courts have determined that this rule allows for judicial notice of federal trademark registrations. *See, e.g., Reed v. General Mills, Inc.*, No. C19-0005-JCC, 2019 WL 2475706 (W.D. Wash. June 13, 2019); *Children's Miracle Network v. Miracles for Kids, Inc.*, No. 8:18-CV-01227, 2018 WL 8243998 (C.D. Cal. Dec. 6,

for the registration of its "Printify" mark on the Principal Registrar and signed by Mr. Berdigans,[6] Defendants described Printify's services as including: "Design printing for others; Digital on-demand printing services of books and other documents; Digital photo printing services; Digital printing; Direct-to-garment printing services; Fine art printing services; Offset printing; Photographic printing; Printing; Printing of advertising brochures for others; Printing of patterns on textiles; Printing services; Screen printing; Silk screen printing."

58.     In support of Defendants' application for the "Printify" trademark, Mr. Berdigans further submitted the then current terms and conditions of Printify, stating that Printify holds title to its products, and that title passes from Printify only after the production of a customized product ordered by an end consumer.  Put another way, even Defendants take the position that title passes from Printify only *after* Printify has already manufactured and created counterfeit or infringing goods.

59.     Printify advertises that any "Printify product" passes three quality control checks, including checks by Printify in-house experts: 1) "[w]hen blank products arrive at *our* printing locations" (emphasis added); 2) "[b]efore printing"; and 3) "[a]fter printing to compare final product against original design."  Given Defendants' control over the manufacturing process, including the fact

---

2018).

[6] Note when signing the declaration for these applications, the foregoing: "The signatory believes that: if the applicant is filing the application under 15 U.S.C. § 1051(a), the applicant is the owner of the trademark/service mark sought to be registered; the applicant is using the mark in commerce on or in connection with the goods/services in the application; the specimen(s) shows the mark as used on or in connection with the goods/services in the application; and/or if the applicant filed an application under 15 U.S.C. § 1051(b), § 1126(d), and/or § 1126(e), the applicant has a bona fide intention, and is entitled, to use the mark in commerce on or in connection with the goods/services in the application. The signatory believes that to the best of the signatory's knowledge and belief, no other persons, except, if applicable, concurrent users, have the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other persons, to cause confusion or mistake, or to deceive. The signatory being warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001, and that such willful false statements and the like may jeopardize the validity of the application or any registration resulting therefrom, declares that all statements made of his/her own knowledge are true and all statements made on information and belief are believed to be true."

that Defendants have the ongoing ability to monitor products before, during, and after creation, the fact that in-house "experts" conduct quality control checks is not surprising.  Likewise, given Defendants' apparent and complete disregard for intellectual property rights, neither is the fact that these checks do nothing to stifle the amount of Counterfeit and Infringing Products manufactured by Defendants, despite Defendants' ability to filter out trademarked and copyrighted material.  Instead, Defendants perpetuate infringement and counterfeiting because it is profitable.

60.     For example, the image below shows a Counterfeit and Infringing Product manufactured by and purchased from Defendants bearing a "QC APPROVED" sticker upon delivery:



61.     In sum, Defendants manufacture and create Counterfeit and Infringing Products that would not have existed but for Defendants' enterprise and exercise control over every step of the process.

### C.     Defendants' Control over Customer Service

62.     Defendants exercise control over customer service relating to the sale of Counterfeit and Infringing Products, including managing and shipping orders and handling customer complaints and

18

returns, through Printify Connect and other Printify services.

63.     With Printify Connect, Defendants promise to "drops the middleman" so that customers can contact **Printify's** "support team directly – **without your involvement**." Printify is the one that manages orders, handles customers, and claims to handle "issues **ourselves**." All the while, end consumers are not informed that Printify is "handling" customer service.

64.     Printify sends emails to customers confirming their orders for Counterfeit and Infringing Products. Printify selects the wording of these emails, and Defendants' Online Storefronts do not have the option of altering this wording.

65.     Once an order for Counterfeit and Infringing Products is delivered, Printify sends an email to the customer "where they can either leave a review or report a problem."

66.     Customers can purportedly report problems "directly to our [Printify] Support Team" and can "request a free replacement or refund." Printify—not any third-party merchant associated with any of Defendants' Online Storefronts—then "evaluate[s] the customer's request and proceed[s] accordingly, informing you [the merchant] of the outcome" and Printify's "final decision."

67.     Notably, if a customer leaves a review, those reviews are "not available to anyone" except Defendants.

**V.     Defendants' Deliberate Concealment in Its Infringement and Counterfeiting Practices**

68.     Defendants have gone to great lengths to try to avoid liability by hiding behind automated practices designed to conceal Printify's identity and the full scope and interworking of Defendants' illegal counterfeiting operation.

69.     To merchants, Defendants represent that Printify "take[s] care of your reprints and refunds directly **without your customers ever knowing it was us**," offers to "make customer support easier for you **behind the scenes without ever referencing Printify**," sends an order confirmation email to customers (that merchants are not even privy to) that "**doesn't reference Printify in any way**," and

provides a page concerning orders where customers "*won't see any reference to Printify*," only Defendants' Online Storefronts.

71. Defendants make it difficult, if not nearly impossible, for customers to ever know Printify's involvement, despite customers dealing directly with Printify in all phases of the purchase of the Counterfeit and Infringing Products.

71. Upon the sale of each Counterfeit and Infringing Product, Printify sends a confirmation email to the customer. Even though Printify sends that email, Defendants alter the "sender" to identify a *fake outgoing email address* from the Defendants' Online Storefront instead.

72. Some of those fake email addresses do not even work, making it difficult for customers to contact Defendants' Online Storefronts via email, considering Printify itself does not provide its own email address.

73. Additionally, Defendants select the return addresses for the shipped packages (sometimes regardless as to whether or not a third-party merchant has opted not to use Printify's "default" return addresses), often selecting random return addresses or virtual addresses that make it difficult for the consumer to track or locate the purported seller of the Counterfeit and Infringing Products, that additionally, more often than not actually originate from nowhere near the listed return location.

## V.     Defendants Actively Discourage the Enforcement of Intellectual Property Rights

74. Despite Defendants' direct involvement and critical role in the manufacture, creation, and distribution of the Counterfeit and Infringing Products, Defendants seek to disclaim any responsibility from liability in respect of their infringing and non-compliant conduct. Indeed, Printify's Terms of Service, Intellectual Property Policy, and disclosures are at odds with Defendants' actual practices and corresponding legal obligations.

75. As established above, Printify controls the infringement and counterfeiting process,

triggering certain legal obligations.  Defendants maintain the Printify Image Database, advertise infringing Atari Marks and designs and encourage others to use them, including on the Printify "mock-up generator," allow a never ending amount of uploaded content that infringes intellectual property rights to be applied to goods in digitized form via its "mock-up generator," manage the printing process that prints the infringing Atari Marks, Bentley Bear Copyright, and designs, as well as the other uploaded infringing content onto physical goods, handle the Counterfeit and Infringing Products after they come off the printers, handle the bagging and shipment of those products, process payments, and handle any customer service issues related to the sale of the Counterfeit and Infringing Products. Additionally, Defendants vigorously publish, advertise, and offer for sale goods bearing the Atari Trademarks and Bentley Bear Copyright through Defendants' Online Storefronts, and in exchange, receive revenue from the sale of the Counterfeit and Infringing Products.

76.     Defendants also attempt to portray Printify as safeguarding intellectual property rights while doing the opposite.  Printify's Intellectual Property Policy claims that Printify "feel[s] strongly" about people "stealing intellectual property," and its Terms of Service "warn" that "Printify may use its discretion to remove Your Content from our Service, at any time, with or without prior notice to you, if it violates any of our Terms of Service or policies *or is reported to be infringing on intellectual property rights of others*."  These words are inconsequential.

77.     In August 2023, for example, a merchant disclosed that its "Etsy account was banned" because of intellectual property infringement.  The merchant's existing Printify account (still active) was connected to the now banned Etsy account.  Seeking to continue selling products on Etsy via Printify, the merchant asked whether Printify would report the merchant (or its Printify account) to Etsy if the merchant created a new Etsy account and connected its existing Printify account to the new Etsy store.  Evading the question posed, Printify responded that the merchant "can [continue to] use your existing Printify account"—making no effort to investigate, even less to take remedial action, on the

reported infringement.   Instead, Printify encouraged the merchant to create a new Etsy account to circumvent Etsy's intellectual property enforcement efforts and simply "connect" its existing Printify account.

78.     Defendants actively discourage any reporting of intellectual property infringement and make it difficult for intellectual property owners to report such incidents. For example:

a.     The link to Defendants' "Trademark Violation Form" (the "Violation Form") is found only through Printify's "Intellectual Property Policy" on www.printify.com (the "IP Policy"), a policy stated to be "an important contract between Printify and our Users" regarding the intellectual property of only those parties—Printify and Printify "Users," not any third party rights holder.  By doing so, Printify suggests from the outset that Printify's IP Policy is not the right place for rights holders to look, even though it is in fact the *only* place where the Violation Form is located.

b.     The IP Policy provides a link to Printify's Violation Form, but states that its use is for Printify Users that may be concerned someone is infringing upon any of *their* trademarks, and not for the use by any third parties whose rights have been infringed by Defendants.

c.     In the event a third party continues on to access the Violation Form even after Defendants' initial attempts to dissuade them from doing so, it is only then apparent that the Violation Form is actually a mechanism, and the *only* mechanism, Defendants provide to report instances of infringements to Defendants, including in connection with Defendants' Online Storefronts.[7]  Even

---

[7] The Violation Form states: "Have you found a website with products made on Printify that you believe is infringing on your trademark? Before you report it, please ask yourself these 3 questions[.]"

then, the Violation Form cautions and discourages reporting, stating that:

1.  If Defendants' Online Storefront is using a trademark to review or criticize products or services, Defendants do not consider that to be trademark infringement, and they will "promptly reject your complaint," so "please don't submit your complaint."

2.  Before reporting, you need to contact Defendants' Online Storefront directly, even by leaving a comment on any social media post requesting the site owner contact you.

3.  You need to confirm that the allegedly infringing product was really created on Printify, and not somewhere else, including a different POD company.

4.  Only if you cannot contact the publicly facing "owner" of Defendants' Online Storefront or cannot resolve the issue with them directly, you are to proceed with filling out the TMV.

d.  Even if a Violation Form is submitted, Defendants make clear that *if they chose to act at all*, they will act only as a mere facilitator between the relevant Printify merchant connected to Defendants' Online Storefront and complainant, notifying the merchant of the complaint and giving them every opportunity to submit a counternotice to the complainant.  Even after that, Defendants maintain it is the merchant's sole discretion as to whether or not any infringing content is ultimately removed and at no stage consider themselves to be a party to the complaint.

79.  Defendants' "reporting" procedures are head-in-the-sand tactics to stifle reporting, for

Defendants' financial benefit.

80.     Additionally, Printify purports to provide "24/7" chat support for merchants seeking "help with anything to do with your Printify account or any orders," but apparently is unable to provide help relating to intellectual property issues on its site, as evidenced below.



## VI.     Printify's History of Violations

81.     This is not the first time Printify has disregarded intellectual property rights.

82.     In 2019, competitor Printful Inc. ("Printful"), arguably Defendants' largest threat in the POD industry, sued Printify for copyright infringement, 17 U.S.C. § 501, and for violations of the Lanham Act, 15 U.S.C. § 1125(a), among other claims.  *See* Complaint, *Printful, Inc. v. Printify, Inc.*, Case No. 5:19-cv-07903 (N.D. Cal. Dec. 2, 2019).

83.     Printful alleged that it had invested years and resources developing and refining a plugin that enabled shipping rate setups for users. *Id.* ¶¶ 12–14.  Shortly after Printful made its copyrighted program available to the public, Printify copied and modified Printful's program and released its own integration.  *Id.* ¶¶ 21–35.  Printify also "removed [Printful's] registered trademark 'Printful' from the [Printful] program in order to pass the Infringing Plugin off as originating wholly from Printify."  *Id.* ¶¶

24

36–39.

84.     The case settled.  As part of the settlement, in addition to monetary payment, Printify admitted to downloading and copying portions of Printful's copyrighted software and was permanently enjoined from unlawfully using Printify's copyrighted software again without providing a copyright notice of Printful's authorship.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### TRADEMARK INFRINGEMENT AND COUNTERFEITING (15 U.S.C. § 1114)

85.     Atari repeats and incorporates by reference its allegations contained in paragraphs 1–76 of this Complaint.

86.     This is a trademark infringement action against Defendants based on their unauthorized use in commerce of counterfeit imitations of the registered Atari Trademarks in connection with the sale, offering for sale, distribution, and/or advertising of counterfeit and infringing goods.  The Atari Trademarks are highly distinctive marks.  Consumers have come to expect the highest quality from Atari's products provided under the Atari Trademarks.

87.     Defendants have manufactured, sold, offered to sell, marketed, distributed, and advertised, and are still selling, offering to sell, marketing, distributing, and advertising products in connection with the Atari Trademarks without Atari's permission.  Alternatively, Defendants have caused to be manufactured, sold, offered to sell, marketed, distributed, and advertised, and are still causing to sell, offer to sell, market, distribute, and advertise products in connection with the Atari Trademarks without Atari's permission.

88.     Defendants are directly liable for the actions described above.

89.     Alternatively, Defendants are vicariously and/or contributorily liable for the actions described above.  Defendants intentionally induce others to infringe the Atari Trademarks.  Defendants

also continue to supply their services to those that Defendants know or have reason to know are engaging in the infringement of the Atari Trademarks.  When Defendants had reason to know that counterfeit Atari goods were being sold through their website, Defendants have been willfully blind by intentionally shielding themselves from discovering the offending listings and the identities of infringers.

90.     Atari is the registered owner of the Atari Trademarks and official source of Atari Products.  The United States Registrations for the Atari Trademarks (Exhibit 1) are in full force and effect.  Upon information and belief, Defendants have knowledge of Atari's rights in the Atari Trademarks and are willfully infringing and intentionally using counterfeits of the Atari Trademarks. Defendants' willful, intentional, and unauthorized use of the Atari Trademarks is likely to cause and is causing confusion, mistake, and deception as to the origin and quality of the counterfeit goods among the general public.

91.     Defendants' activities constitute willful trademark infringement and counterfeiting under 15 U.S.C. §§ 1114, 1117.

92.     The injuries and damages sustained by Atari have been directly and proximately caused by Defendants' wrongful reproduction, use, advertisement, promotion, offering to sell, and sale of counterfeit Atari products.  Alternatively, the injuries and damages sustained by Atari have been directly and proximately caused by Defendants' causing of the wrongful reproduction, use, advertisement, promotion, offering to sell, and sale of counterfeit Atari products.

93.     Atari has no adequate remedy at law, and, if Defendants' actions are not enjoined, Atari will continue to suffer irreparable harm to its reputation and the goodwill of its well-known Atari Trademarks.

## SECOND CAUSE OF ACTION
## TRADEMARK DILUTION (15 U.S.C. § 1125(c))

94.     Atari repeats and incorporates by reference its allegations contained in paragraphs 1–76 of this Complaint.

95.     Atari has engaged in extensive nationwide advertising, promotion, and use of the Atari Trademarks for many years.  Atari has had massive sales of goods and services bearing such marks for decades.

96.     The Atari Trademarks have for many years received extensive unsolicited media attention nationwide.  Such extensive and frequent media attention and commercial success has had a substantial impact on the public and has long created an association in the minds of consumers between Atari and the Atari Marks, such that these marks are famous and were famous nationwide before Defendants commenced their unauthorized use of those marks.

97.     Defendants' actions, including Defendants' association of the Atari Marks with the "Cocaine Bear" infringing on the Bentley Bear Copyright, all occurring after the Atari Marks became famous, are likely to cause dilution by blurring and dilution by tarnishment of the distinctive quality of those trademarks in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

98.     Defendants are directly, vicariously, and/or contributorily liable for the actions described above.

99.     The actions of Defendants described above have at all times relevant to this action been willful.

100.    As a direct and proximate result of the actions of Defendants as alleged above, Atari has been and will continue to be damaged and irreparably harmed.

101.    Atari has no adequate remedy at law.

### THIRD CAUSE OF ACTION
### FALSE DESIGNATION OF ORIGIN (15 U.S.C. § 1125(a))

102.    Atari repeats and incorporates by reference its allegations contained in paragraphs 1–76 of this Complaint.

103.    Defendants' promotion, marketing, offering for sale, and sale of counterfeit Atari products has created and is creating a likelihood of confusion, mistake, and deception among the general public as to the affiliation, connection, or association with Atari or the origin, sponsorship, or approval of Defendants' counterfeit Atari products by Atari.    Alternatively, Defendants' causing of the promotion, marketing, offering for sale, and sale of counterfeit Atari products has created and is creating a likelihood of confusion, mistake, and deception among the general public as to the affiliation, connection, or association with Atari or the origin, sponsorship, or approval of Defendants' counterfeit Atari products by Atari.

104.    By using the Atari Trademarks in connection with the sale of counterfeit Atari products, Defendants create a false designation of origin and a misleading representation of fact as to the origin and sponsorship of the counterfeit Atari products.

105.    Defendants' conduct constitutes willful false designation of origin and misrepresentation of fact as to the origin and/or sponsorship of the counterfeit Atari products to the general public under 15 U.S.C. §§ 1114, 1125.

106.    Atari has no adequate remedy at law, and, if Defendants' actions are not enjoined, Atari will continue to suffer irreparable harm to its reputation and the goodwill of its brand.

### FOURTH CAUSE OF ACTION
### COPYRIGHT INFRINGEMENT (17 U.S.C. § 101, et seq.)

107.    Atari repeats and incorporates by reference its allegations contained in paragraphs 1–76 of this Complaint.

108.    Atari owns all exclusive rights, including without limitation the rights to reproduce the copyrighted work in copies, to prepare derivative works based upon the copyrighted work, and to distribute copies of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending, in various copyrights for the Atari products, including without limitation the Bentley Bear Copyright.

109.    Defendants have sold, offered to sell, marketed, distributed, and advertised, and are still selling, offering to sell, marketing, distributing, and advertising products in connection with the Atari copyright without Atari's permission.  Alternatively, Defendants have caused to be sold, offered to sell, marketed, distributed, and advertised, and are still causing the selling, offering to sell, marketing, distributing, and advertising products in connection with the Atari copyright without Atari's permission.

110.    Defendants had access to the Atari products incorporating Atari's registered Bentley Bear Copyright before Defendants created the infringing Atari products.

111.    Upon information and belief, Defendants have directly copied Atari's Bentley Bear Copyright.  Alternatively, Defendants' representations of Atari's Bentley Bear Copyright through at least the Defendants' Online Storefronts are strikingly similar, or at the very least substantially similar, to Atari's Bentley Bear Copyright and constitute unauthorized copying, reproduction, distribution, creation of a derivative work, and/or public display of Atari's Bentley Bear Copyright.  As just one example, Defendants deceive unknowing consumers by using the Bentley Bear Copyright without authorization on products advertised via the Defendant's Online Storefronts to attract customers on the next page as follows:

*Image of Atari's Registered Bentley Bear Copyright*



*Compared to Exemplary Counterfeit and Infringing Atari Products*
*Sold by Defendants' Online Storefronts*





112.    Defendants' exploitation of Atari's Bentley Bear Copyright in connection with

Defendants' Online Storefronts constitutes infringement of Atari's Bentley Bear Copyright.

113.    On information and belief, Defendants' infringing acts were willful, deliberate, and committed with prior notice and knowledge of Atari's copyright.  Each Defendant willfully, wantonly, and in conscious disregard and intentional indifference to the rights of Atari made and distributed in the United States, including this District, caused to be made and distributed in the United States, including this District, and aided, abetted, contributed to, and participated in the unauthorized making and distribution of Counterfeit and Infringing Products.

114.    Each Defendant either knew, or should have reasonably known, that Atari's genuine products, particularly those depicting a famous Atari character from its iconic Crystal Castles game, Bentley Bear, were protected by copyright and their representations infringed on Atari's copyright. Each Defendant continues to infringe upon Atari's rights in and to the Bentley Bear Copyright.

115.    Defendants are directly, vicariously, and/or contributorily liable for the actions described above.

116.    Atari has no adequate remedy at law, and, if Defendants' actions are not enjoined, Atari will continue to suffer irreparable harm to its reputation and the goodwill of its well-known Bentley Bear Copyright.

**FIFTH CAUSE OF ACTION**
**UNFAIR COMPETITION (New York Common Law)**

117.    Atari repeats and incorporates by reference its allegations contained in paragraphs 1–76 of this Complaint.

118.    Atari has not licensed or authorized Defendants to use the Atari Trademarks or Bentley Bear Copyright, and none of the Defendants are authorized retailers of genuine Atari Products.

119.    Defendants knowingly and intentionally trade upon Atari's reputation and goodwill by selling and/or offering for sale products in connection with Atari's Atari Trademarks and/or Bentley Bear Copyright.  Alternatively, Defendants knowingly and intentionally trade upon Atari's reputation

and goodwill by causing products to be offered for sale and/or sold in connection with the Atari Trademarks and/or Bentley Bear Copyright.

120.    Defendants' promotion, marketing, offering for sale, and sale of Counterfeit and Infringing Products has created and is creating a likelihood of confusion, mistake, and deception among the general public as to the quality, affiliation, connection, or association with Atari or the origin, sponsorship, or approval of Defendants' Counterfeit and Infringing products by Atari.  Alternatively, Defendants' causing of the promotion, marketing, offering for sale, and sale of Counterfeit and Infringing Products has created and is creating a likelihood of confusion, mistake, and deception among the general public as to the quality, affiliation, connection, or association with Atari or the origin, sponsorship, or approval of Defendants' Counterfeit and Infringing Products by Atari.

121.    Defendants knew, or should have known, that their promotion, marketing, offering for sale, and sale of counterfeit Atari products has caused and will continue to cause confusion, mistake, and deception among purchasers, users, and the public.   Alternatively, Defendants knew, or should have known, that their causing of promotion, marketing, offering for sale, and sale of counterfeit Atari products has caused and will continue to cause confusion, mistake, and deception among purchasers, users, and the public.

122.    In fact, Defendants have fraudulently represented by their statements and actions that the Counterfeit and Infringing Products are Atari's products including, for example, by using deceptive advertising practices in connection with the Defendants' Online Storefronts, and taking other steps to deceive and confuse the consuming public.

123.    On information and belief, Defendants' conduct is willful and intentional as Defendants attempt to avoid liability by concealing Printify's identity and using Defendants' Online Storefronts to operate their illegal counterfeiting operations.

124.    Atari has no adequate remedy at law, and Defendants' conduct has caused Atari to suffer

damage to its reputation and goodwill.  Unless enjoined by the Court, Atari will suffer future irreparable harm as a direct result of Defendants' unlawful activities.

## PRAYER FOR RELIEF

WHEREFORE, Atari prays for judgment against Defendants as follows:

1.      An injunction temporarily, preliminarily, and permanently enjoining Defendants and their employees, agents, officers, directors, owners, shareholders, principals, subsidiaries, related companies, affiliates, distributors, dealers, retailers, wholesalers, manufacturers, vendors, successors, assigns, and all persons acting for, with, by, through, under, or in active concert with them from:

a.      using the Atari Trademarks or Bentley Bear Copyright in any way, including without limitation for any reproductions, counterfeit copies, or colorable imitations thereof in any manner in connection with the manufacture, distribution, marketing, advertising, offering for sale, or sale of any product that is not a genuine Atari product or is not authorized by Atari to be sold in connection with the Atari Trademarks or Bentley Bear Copyright;

b.      passing off, inducing, or enabling others to sell or pass off any product as a genuine Atari product or any other product produced by Atari that is not Atari's or not produced under the authorization, control, or supervision of Atari and approved by Atari for sale under the Atari Trademarks or Bentley Bear Copyright;

c.      committing any acts calculated to cause consumers to believe that Defendants' Counterfeit and Infringing Products are those sold under the authorization, control, or supervision of Atari, or are sponsored by, approved by, or otherwise connected with Atari;

d.      further infringing the Atari Trademarks or Bentley Bear Copyright and damaging Atari's goodwill;

33

e.      shipping, delivering, holding for sale, transferring, or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for Atari, nor authorized by Atari to be sold or offered for sale, and which bear any Plaintiff trademark or copy any Atari copyright, including the Atari Trademarks or Bentley Bear Copyright or any reproductions, counterfeit copies, or colorable imitations thereof;

f.      using, linking to, transferring, selling, exercising control over the Defendants' Online Storefronts, or any other domain name or online marketplace account that is being used to sell or is the means by which Defendants could continue to sell counterfeit Atari Products; and

g.      operating and/or hosting websites that are involved with the distribution, marketing, advertising, offering for sale, or sale of any product bearing the Atari Trademarks or Atari or any reproduction, counterfeit copy or colorable imitation thereof that is not a genuine Atari Product or not authorized by Atari to be sold in connection with the Atari Trademark or Bentley Bear Copyright; and

h.      assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in the subparagraphs above.

2.      An order directing Defendants to destroy all marketing, advertising, or promotional materials depicting or referring to such Counterfeit and Infringing Products, confirm such destruction in writing to Atari, and provide to Atari the identity and complete contact information and payee information for all persons and entities that made, produced, or advertised or sold the Counterfeit and Infringing Products.

3.      An order requiring Defendants to account for and pay to Atari all profits arising from the unlawful acts herein alleged, and an increasing of such profits for payment to Atari as provided by 15

U.S.C. § 1117 and any other applicable statute or law.

4.      An order requiring Defendants to pay Atari statutory damages pursuant to 15 U.S.C. § 1117(c) of not less than $1,000 and not more than $2,000,000 for each and every use of the Atari Trademarks and statutory damages of not less than $750 and not more than $30,000 for each and every infringement of the Bentley Bear Copyright pursuant to 17 U.S.C. § 504(c), which should be enhanced to a sum of not more than $150,000 by 17 U.S.C. § 504(c)(2) because of Defendants' willful copyright infringement.

5.      Compensatory damages according to proof.

6.      Punitive damages according to proof.

7.      Reasonable attorneys' fees and costs.

8.      Prejudgment interest on all damages awarded by this Court.

9.      An order awarding any and all other relief that this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff respectfully demands a trial by jury on all claims.

Dated: October 7, 2023                    Respectfully submitted,

                                          **BOIES SCHILLER FLEXNER LLP**

                                   By:  */s/ Christopher Tom*
                                          Christopher Tom
                                          ctom@bsfllp.com
                                          55 Hudson Yards, 20th Fl.
                                          New York, NY 10001
                                          Telephone: (212) 446-2300

                                          Katie Kavanaugh*
                                          kkavanaugh@bsfllp.com
                                          Genesis Shin*
                                          gshin@bsfllp.com
                                          2029 Century Park East, 1520N
                                          Los Angeles, CA 90067

Telephone: (213) 629-9040

Maxwell Pritt*
mpritt@bsfllp.com
Beko O. Reblitz-Richardson*
brichardson@bsfllp.com
44 Montgomery St., 41st Floor
San Francisco, CA  94104
Telephone: (415) 293-6800

Rossana Baeza*
rbaeza@bsfllp.com
Brittany Zoll
bzoll@bsfllp.com
100 SE 2nd Street, Suite 2800
Miami, FL 33131
Telephone: (305) 357-8436

*Application to appear *pro hac vice*
forthcoming

*Attorneys for Plaintiff*
*Atari Interactive, Inc.*