UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ATARI INTERACTIVE, INC.,

                             Plaintiff,

            -against-

PRINTIFY, INC., JANIS BERDIGANS, and JOHN DOES 1-10,

                             Defendants.

23-CV-8926 (SHS)

Opinion & Order

SIDNEY H. STEIN, U.S. District Judge.

    Atari Interactive, Inc., a video game company that licenses its widely known trademarks for use on a variety of merchandise, brings this trademark infringement action against Printify, Inc., a print-on-demand company, and its founder Janis Berdigans. Following the entry of an *ex parte* temporary restraining order ("TRO"), Atari now moves for the entry of a preliminary injunction prohibiting defendants from infringing Atari's trademarks. Because Atari has not shown that it is likely to succeed on the merits or that it will suffer irreparable harm absent a preliminary injunction, the Court denies Atari's motion.

    I.    **Background**

    Print-on-demand providers, such as Printify, facilitate the design, purchase, and fulfillment of custom merchandise. That custom merchandise is, at times, designed with infringing marks. A central issue in this action is whether Printify's participation in the process crosses the line from mere facilitation to "use" of the allegedly infringing marks by Printify. Accordingly, a detailed explanation of Printify's operations is necessary.

    Printify's customers ("merchants") are typically businesses who want to design and sell merchandise, such as t-shirts or coffee mugs, to end-consumers on third-party websites. Think of the merchant as a corner coffee shop or someone who wants to start a business selling apparel with custom designs; the third-party website as either online marketplaces like eBay or Etsy, or as the coffee shop's own website; and the end-consumer as whoever purchases the t-shirt or coffee mug. Without a print-on-demand solution, a merchant would often need to place an upfront, bulk order of the merchandise it wishes to sell and hold the merchandise as inventory. In contrast, Printify allows the merchant to print individual products if and when they are ordered,

1

and have those products shipped directly to the end-consumer through Printify's network of third-party printers. Such a process is designed to reduce upfront costs to the merchant. (Decl. of Anastasija Oleinika, ECF No. 53-1 ¶ 7.)

Printify's process of print-on-demand works as follows: First, a merchant selects a particular product (*e.g.*, "Unisex Crewneck Sweatshirt") and uses Printify's built-in software to add whatever design the merchant wants to add to the product. A merchant can upload its own images for the design or choose from a library of images supplied by Shutterstock, among other options. (*Id*. ¶¶ 7-8.) Printify's operations are significant in size: roughly 120,000 images are uploaded to Printify every day, adding to the 121 million images already in Printify's database of images. (*Id*. ¶ 22.) A merchant cannot view or use images uploaded by other merchants and Printify claims that the images provided through Shutterstock are licensed. (*Id*. ¶¶ 8, 28.) Each product also contains a default, generic text description of the physical product (*i.e.*, t-shirt), but the merchant can choose to revise the description in order to add details about its custom design. (*Id*. ¶¶ 10, 17.) Printify does not review the product design at any time in the process. (*Id*. ¶ 9.)

Once the product is designed, the merchant "publishes" the product, adding it to Printify's database of available products for purchase. (*Id*. ¶ 11.) Aside from a "small percentage" of merchants who have a "Printify Pop-Up" store, which is a storefront hosted by Printify, merchants do not sell their products on Printify's website. Instead, merchants usually link their Printify account to an external sales channel, such as Etsy, Shopify, or eBay, and customers purchase the product through those channels. (*Id*. ¶¶ 12-14.) The merchandise can also be sold on the merchant's own website. (*Id*. ¶ 12.) Once a customer purchases a product, the order is routed through Printify to a third-party printer, which manufactures the product and ships it directly to the end customer. (*Id*. ¶¶ 18, 21.) This entire process is automated, and though Printify conducts periodic quality checks on the printers to ensure the printers meet Printify's overall product standards, Printify does not review products before they are shipped to the customer. (*Id*. ¶¶ 18-19.) The merchant chooses what return address will be used on the mailing package, and neither the packaging nor the product itself identifies Printify in any way. (*Id*. ¶ 15; ECF No. 28-5.) Printify never takes possession of the product and does not hold any inventory of the product. For certain merchants, Printify will handle customer service functions, such as facilitating customer feedback and complaints. (*See, e.g.*, ECF No. 66-9.) For each piece of merchandise, Printify charges the merchant a fixed fee and

the merchant independently decides what price the end-consumer will be charged for the merchandise. (Oleinika Decl. ¶ 20.)

Due to the volume of images uploaded and the automated nature of Printify's processes, Printify states that manually reviewing whether merchant designs violate any intellectual property rights "would be inefficient, costly, and practically impossible." (*Id*. ¶ 18.) Still, Printify's intellectual property policy clearly prohibits infringement, affirming that Printify will "either disable or terminate the accounts of Users who infringe or are repeatedly charged with infringing" intellectual property rights. (*Id*. ¶ 26.) But because proactive monitoring for infringement is "practically impossible" given the 120,000 images that are uploaded to its platform daily, Printify "relies on IP owners to help Printify identify and stop" infringement. (*Id*. ¶ 18.)

Atari brings this lawsuit because it identified products, designed and offered by merchants, which allegedly infringe on Atari's trademarks, including the well-known Atari logo. (*See, e.g.*, Am. Compl., ECF No. 63 ¶ 43.) Specifically, Atari claims that Printify and its founder Janis Berdigans have facilitated merchandise orders that violate Atari's registered trademarks and are liable for direct copyright infringement (15 U.S.C. § 1114), contributory copyright infringement,[1] trademark dilution (15 U.S.C. § 1125(c)), false designation of origin (15 U.S.C. § 1125(a)), and unfair competition under New York common law.

Prior to initiating this lawsuit, Atari sent cease-and-desist letters to various merchants with potentially infringing products.[2] Printify itself was not sent and did not receive any of these letters. (Decl. of Katie Kavanaugh, ECF No. 28 ¶ 2; Oleinika Decl. ¶¶ 23, 29.) However, once Printify was put on notice of the infringement by this lawsuit, it took meaningful steps to remove identifiable infringing content from its own system. (*Id*. ¶¶ 31-42.) As described in more detail below, Printify removed potentially infringing products from Printify's database, which effectively disables a merchant

---

[1] "Contributory trademark infringement is a judicially created doctrine that derives from the common law of torts." *Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F.3d 93, 103 (2d Cir. 2010).

[2] Atari claims that its counsel "sent 70 cease and desist letters" (ECF No. 25 at 2) to "various e-commerce storefronts believed to be associated with Defendants." (Kavanaugh Decl. ¶ 2.) At oral argument, Atari continued to elide the difference between merchant storefronts and Printify, emphasizing repeatedly to the Court that infringing products were still available without clarifying that the product listings were, in fact, on *merchant* websites. (ECF No. 84.) The only listings presented at oral argument from Printify's own website were created by counsel for Atari for purposes of this litigation. (*See* ECF No. 79-1.)

from fulfilling a customer's order of that product through Printify's system. Printify has no control over merchants' customer-facing websites, and therefore cannot remove infringing products from those sites. (*Id.* ¶ 17.) Indeed, as Atari points out, infringing products appear to still be available on the merchants' websites. (*See, e.g.,* ECF Nos. 64-12, 64-13.) Moreover, removing the specific instances identified by Atari from Printify's own database does not stop a merchant from designing a new infringing product tomorrow. Potentially infringing Atari marks are also still available if listed in the Shutterstock library. (*See, e.g.,* ECF No. 64-15.)

Atari initially moved for an *ex parte* TRO, which the Court granted on October 24, 2023. (ECF No. 21.) In that TRO, the Court granted Atari's request to freeze Printify's assets based on Atari's *ex parte* representation that Printify "likely will hide or move their ill-gotten funds to offshore bank accounts" and is "likely to take whatever action they can to hide, move, conceal, or potentially squander assets to avoid enforcement as soon as they find out about this suit." (ECF No. 25 at 29-30.) After being notified by financial institutions that its accounts were frozen, Printify agreed to a joint stipulation modifying the TRO to remove the asset freeze provisions. (ECF No. 11.) There is no evidence in this record that Printify ever intended to hide or move its assets to offshore bank accounts.

Atari now moves for a preliminary injunction against Printify; oral argument was held on December 12, 2023.

## II. Discussion

### A. Legal Standard

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion." *Sussman v. Crawford*, 488 F.3d 136, 139 (2d Cir. 2007) (per curiam) (emphasis in original) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). *See also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right."). A party seeking a preliminary injunction must show "(1) a likelihood of success on the merits[,] or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of hardships tips in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an injunction." *Colony Grill Dev., LLC v. Colony Grill, Inc.*, Nos. 23-507-cv, 23-691-cv, 2023

U.S. App. LEXIS 27798, at *6 (2d Cir. Oct. 19, 2023) (quoting *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015)).

### B. Atari Has Not Shown a Likelihood of Success on the Merits

Atari urges that a preliminary injunction is warranted based on its likelihood of succeeding on claims of (1) direct trademark infringement, (2) contributory trademark infringement, (3) trademark related and state law claims, and (4) claims against Janis Berdigans.[3] Each will be addressed in turn.

#### 1. *Direct Trademark Infringement*

A defendant is liable for infringement under the Lanham Act if it, "without the consent of the registrant, use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1). A counterfeit mark is defined as "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127. Courts analyze Lanham Act claims using a two-prong test: (1) whether the plaintiff's mark is entitled to protection; and (2) whether defendant's use of the mark is likely to cause confusion. *See Guthrie Healthcare Sys. v. ContextMedia, Inc.*, 826 F.3d 27, 37 (2d Cir. 2016).

Printify does not dispute that the mark is entitled to protection, that confusion is likely, or that the alleged infringements meet the definition of counterfeit. Instead, Printify contends that it does not "use" the marks as a seller within the meaning of the Lanham Act because, as a "broker between artists (Merchants), their customers, and the printers," Printify "merely facilitates or assists others' use" of the marks. (ECF No. 53 at 10.) The statutory definition for "use in commerce" is broad and encompasses "the *bona fide* use of a mark in the ordinary course of trade" when "placed in any manner on the goods . . . and the goods are sold or transported in commerce." 15 U.S.C. § 1127. Even so, cases do find that the statute does not necessarily apply to brokers, facilitators, or transactional intermediaries. As the U.S. Court of Appeals for the Sixth Circuit explained, passive marketplaces like eBay or Amazon "that facilitate sales for

---

[3] Atari does not seek a preliminary injunction on the alternative basis that there are "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tip[s] decidedly in the plaintiff's favor." *Colony Grill*, 2023 U.S. App. LEXIS 27798, at *6. Accordingly, the Court will not analyze this alternative.

independent vendors . . . generally escape Lanham Act liability," while "parties who design and print trademark-infringing goods typically violate the Lanham Act." *Ohio State Univ. v. Redbubble, Inc.*, 989 F.3d 435, 446 (6th Cir. 2021); *see also GMA Accessories, Inc. v. BOP, LLC*, 765 F. Supp. 2d 457, 464 (S.D.N.Y. 2011) (denying plaintiff's summary judgment on direct infringement because the evidence was insufficient to support finding the defendant was a seller, as opposed to a broker). The critical question is where the alleged infringer—here, Printify—falls on the following spectrum: does it "avoid[] liability by acting as a passive facilitator," or exercise sufficient control "over the creation, manufacture, or sale of offending goods to be considered akin to a 'seller' or 'manufacturer' to whom Lanham Act liability applies?" *Ohio State Univ.*, 989 F.3d at 447.

This is not the first trademark infringement lawsuit to be brought against a print-on-demand company. For example, the parties cite to multiple cases against the print-on-demand company Redbubble, Inc., which analyze whether it is liable for "using" a mark under the Lanham Act. Though these out-of-circuit decisions are not binding on this Court, their reasoning is applicable to this case.

One of the cases against Redbubble was also brought by Atari. In *Atari Interactive, Inc. v. Redbubble, Inc.*, 515 F. Supp. 3d 1089 (N.D. Cal. 2021), the U.S. District Court for the Northern District of California analyzed similar infringement claims against Redbubble, an online marketplace where customers could purchase merchandise with artist-designed content, including content that infringed on Atari's trademarks. The court denied both parties' summary judgment motions on direct infringement, finding that "while there is something much more than 'no evidence' that Redbubble acts as a seller, Atari has not established that Redbubble is a seller as a matter of law." *Id*. at 1105. This evidence included Redbubble's involvement in selecting the physical products, taking responsibility for damaged goods and arranging replacements, and handling excess inventory from returns. *Id*. at 1102-1103. The case proceeded to trial and a jury found that Redbubble was ***not liable*** for direct infringement. *See* Jury Verdict, *Atari Interactive, Inc. v. Redbubble, Inc.*, No. 18-cv-03451 (N.D. Cal. Nov. 4, 2021), ECF No. 253.

In *Ohio State Univ.*, the Sixth Circuit also analyzed infringement claims against Redbubble and denied summary judgment on those claims, finding that the record below lacked sufficient factual development to decide whether Redbubble was selling goods or acting as an intermediary. *Ohio State Univ.*, 989 F.3d at 448. The district court had granted summary judgment for Redbubble on the grounds that it did not "use"

6

Ohio State's trademarks in operating its business because it acted only as a "transactional intermediary" between buyers, sellers, manufacturers, and shippers. *Id*. at 441. The circuit court set out certain factors to consider in determining whether Redbubble was using the marks, including "the degree of control and involvement exercised by Redbubble over the manufacturing, quality control, and delivery of goods to consumers." *Id*. at 448. Based on its analysis of the record below, the Sixth Circuit reversed the district court decision, providing the following explanation for why the district court's grant of summary judgment for Redbubble had been improper:

> "[O]ne key distinction between a direct seller who 'uses' a trademark under the Act and a mere facilitator of sales who does not is the degree to which the party represents itself, rather than a third-party vendor, as the seller, or somehow identifies the goods as its own. A retailer who sells products directly to a customer at a brick-and-mortar store is indisputably a seller to whom the Lanham Act applies. An online marketplace like eBay that clearly indicates to consumers that they are purchasing goods from third-party sellers is not. Here, although the record is sparse, it appears that products ordered on Redbubble's website do not yet exist, come into being only when ordered through Redbubble, and are delivered in Redbubble packaging with Redbubble tags. Under those facts, the district court erred in affirmatively placing Redbubble on the passive end of the liability spectrum."

*Id*. (internal citations omitted).

As in the Redbubble cases, the evidence before this Court is mixed. Atari urges that Printify is more akin to a seller than a facilitator, with a high degree of control over the infringing products. For example, Printify provides the software that merchants use to design the potentially infringing products, provides access to potentially infringing images through the Shutterstock library, monitors the quality of the printers, and engages in various customer support activities. Printify, on the other hand, emphasizes the facts suggesting it is a passive facilitator of orders by merchants. In particular, Printify does not design the products, does not manufacture or print the products, and does not ship the products. The products are quality-checked by the third-party printer and Printify claims that it engages in routine monitoring only to ensure that the printer is generally up to Printify's standards. Aside from the "small percentage" of merchants who use Printify Pop-Up Shops, the products are not sold on Printify-operated websites.

Based on the facts presented at this early stage of litigation, Atari's case for direct infringement against Printify is weaker than was its case against Redbubble in the

Northern District of California. Customers purchase goods directly on Redbubble's website and the order arrives with Redbubble tags in Redbubble packaging. This differs significantly from Printify. The vast majority of Printify customers purchase directly from the merchant, the orders do not arrive in Printify packaging, and Printify does not otherwise "identif[y] the goods as its own." (ECF Nos. 28-4, 28-5, 28-6.) Customers go through the entire purchase process—from browsing to ordering to receiving delivery—without any knowledge that the order is being facilitated by Printify.[4] Notably, even though the evidence of Redbubble having "used" Atari's trademark was stronger in *Atari Interactive, Inc. v. Redbubble, Inc.*, No. 18-cv-03451 (N.D. Cal.) than it is here, the jury in that case found against Atari when the action went to trial. Accordingly, the Court is not persuaded that Atari is *likely* to succeed in this facially weaker case.

The additional cases cited by the parties do not suggest otherwise. Atari cites a case in which the U.S. District Court for the District of Wisconsin determined that SunFrog, another print-on-demand company, "used" the infringed marks of Harley-Davidson ("H-D"). *H-D U.S.A., LLC v. SunFrog, LLC*, 311 F. Supp. 3d 1000 (E.D. Wis. 2018). However, this case is distinguishable on the facts and H-D's claims against SunFrog appear significantly stronger than Atari's current claims against Printify. As the court described, SunFrog "advertises infringing designs and trains and encourages others to do so, owns and runs its automated printers that print the infringing designs onto physical goods, handles products after they come off of the printers, bags and ships those products, and processes payment." *Id*. at 1029-30. SunFrog also runs "an online retail marketplace" for consumers to purchase the goods and "affixes its own trademarks and logos" to the product. *Id*. at 1013-14. Accordingly, SunFrog "exerts control over nearly every aspect of the advertising, sale, and manufacture of the infringing goods, save designing the mockups." *Id*. at 1030. By contrast, there is no evidence in this record that Printify engages in any advertising or trains or encourages anyone to use infringing designs. In addition, the evidence *does* reflect that Printify does not own or operate any printers, does not handle the products after printing, and does not ship or affix its logo to any products.

Finally, the lone case from our Circuit cited by the parties on this issue generally supports Printify's position. In *GMA Accessories, Inc. v. BOP, LLC*, 765 F. Supp. 2d 457

---

[4] Again, with the exception of the "small percentage" of merchants who have a Printify Pop-Up store.

(S.D.N.Y. 2011), a trademark holder sued a wholesale clothing showroom company that displayed counterfeit products on its showroom floor. As here, the defendant claimed that it was a broker of the products and should not be liable as a seller. In that case, Judge P. Kevin Castel denied plaintiff's summary judgment motion, finding "no evidence that [defendant] took title to the merchandise, maintained an inventory of merchandise, bore the risk of loss or other traditional indicia of status as seller." *Id*. at 464. The court also credited evidence that the defendant only collected commissions on the sales, which is consistent with being a broker. *Id*. Here, though Printify is more actively involved than a passive showroom broker, it does not take title to merchandise or maintain inventory. Printify's fee-based payment structure is also consistent with being an intermediary. Accordingly, these indicia also support finding for Printify.

In sum, Atari has not shown it is likely to be successful in demonstrating that Printify is "using" its marks, as opposed to acting as a passive facilitator.

### 2. *Contributory Trademark Infringement*

A defendant is liable for contributory trademark infringement if (1) it intentionally induces another to infringe a trademark or (2) it continues to supply its service to one whom it knows or has reason to know is engaging in trademark infringement. *See Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 106 (2d Cir. 2010) (citing *Inwood Labs. v. Ives Labs.*, 456 U.S. 844, 854 (1982)). For the second prong, general knowledge of infringement is insufficient. Instead, "[s]ome contemporary knowledge of **which particular listings are infringing** or will infringe in the future is necessary" for a determination that the defendant engaged in contributory trademark infringement. *Tiffany*, 600 F.3d at 107 (emphasis added). Where a defendant on notice of specific infringement "undertakes bona fide efforts to root out infringement, . . . that will support a verdict finding no liability, even if the defendant was not fully successful in stopping infringement. But if the defendant decides to take no or little action, it will support a verdict finding liability." *Omega SA v. 375 Canal, LLC*, 984 F.3d 244, 255 (2d Cir. 2021).

The first prong of the test—intentionally inducing another to infringe a trademark—is not at issue. Regarding the second prong, Printify was put on notice as to certain potential infringing uses as of the filing of this lawsuit. At issue, then, is whether Printify has undertaken bona fide efforts to remove those particular listings. The answer is yes.

Specifically, Printify has undertaken two strategies to remove potentially infringing marks after being put on notice. First, Printify searched its own database for the 70 URLs identified by Atari in ECF No. 28-1 as linking to merchant websites with potentially infringing products. Printify manually reviewed a sample of nearly 60,000 of those merchants' product sales and removed from its database the 37 products that it identified as potentially infringing. In addition, Printify proactively searched its database for keywords such as "Atari," manually reviewed the results, and removed any additional potentially infringing uses from the database. (Oleinika Decl. ¶¶ 31-42.) Atari has introduced no evidence to the contrary. Once a product has been removed from the database, the merchant is unable to place orders with Printify for those products. (Oleinika Decl. ¶ 42.) A similar approach was deemed sufficient to deny Atari's summary judgment motion against Redbubble. *Atari Interactive, Inc. v. Redbubble, Inc.*, 515 F. Supp. 3d at 1109 (finding Redbubble's keyword searches and an "attempt[] to screen based on its own judgment" was not "unreasonable").

Atari raises three arguments in response. First, Atari contends that Printify's "limited, manual keyword searches" and plan to remove infringements only when notified are insufficient—especially where another print-on-demand company's similar approach using "anticounterfeiting technology" was deemed insufficient in *SunFrog*, 311 F. Supp. 3d 1000. (ECF No. 66 at 6.) But, as discussed above, the facts in *SunFrog* are distinguishable. While the court did find that SunFrog "cannot build a business around promoting and manufacturing infringing designs and then be freed from liability merely because it offers a notice-and-takedown procedure," *SunFrog*, 311 F. Supp. 3d at 1039, Printify does not promote or manufacture the infringing designs.[5] The relatively low number of potential infringements compared to the total number of images in

---

[5] Atari relies on *SunFrog* to suggest that Printify is willfully blind to infringement and therefore does not need to be put on notice of specific infringing products under the *eBay* standard. *See Omega SA v. 375 Canal, LLC*, 984 F.3d 244, 248 (2d Cir. 2021) ("In *Tiffany*, we held that a defendant may be liable for contributory trademark infringement if it was willfully blind as to the identity of potential infringers— that is, under circumstances in which the defendant did not know the identity of specific infringers."). However, *SunFrog* is distinguishable on the facts and this case alone is certainly not sufficient to support finding that Atari is likely to succeed in showing that Printify is willfully blind.

Printify's database also suggests that Printify has not "buil[t] a business around" infringement.

Second, Atari claims that "all but one of the previously identified listings are still accessible," citing to screenshots of the *merchant* storefronts where the infringing products are still available. (ECF No. 66 at 6.) However, the merchant storefronts are not under Printify's control. Printify did what it was able to do: it deleted the offending product listings in its system, but it has no ability to prohibit an independent storefront from continuing to list a product on its own website or from fulfilling an order through another print-on-demand provider.

Third, Atari claims that infringing images are still available through the Shutterstock library in Printify's design software. Putting aside the issue of whether these images qualify under *eBay* as "particular *listings*," Printify has no control over the Shutterstock images and states that Shutterstock holds licenses to the images it makes available. (Oleinika Decl. ¶ 28.)

In sum, there is no evidence that Printify intentionally induced anyone to infringe Atari's trademarks. In regard to whether or not Printify services merchants who it has reason to believe are engaging in trademark infringement, the evidence is that Printify has taken concrete steps to search and remove even potentially infringing product listings. Accordingly, Atari has not shown a likelihood of success on its contributory infringement claim.

### 3. *Other Trademark and State Law Claims*

Atari claims that a preliminary injunction is also warranted because it is likely to succeed on the merits of its trademark dilution, false designation of origin, and New York unfair competition claims. The Court disagrees.

#### i. *Trademark Dilution*

Pursuant to 15 U.S.C. § 1125(c), "the owner of a famous, distinctive mark" is entitled to an injunction against a party whose commercial use of that mark "is likely to cause dilution by blurring or dilution by tarnishment." A defendant is liable for trademark dilution based on the following test: (1) the senior mark must be famous; (2) it must be distinctive; (3) the junior use must be a commercial use in commerce; (4) it must begin after the senior mark has become famous; and (5) it must cause dilution of the distinctive quality of the senior mark. *See Savin Corp. v. Savin Group*, 391 F.3d 439, 448–49 (2d Cir. 2004) (citing 15 U.S.C. § 1125(c)). Section 1125(c) recognizes two types of dilution: (1) "blurring, which is the diminished ability of the mark to serve as a unique

identifier of the plaintiffs' goods and services," and (2) "tarnishment, which is the disparagement of the mark's reputation." *Biosafe-One, Inc. v. Hawks*, 524 F. Supp. 2d 452, 466 (S.D.N.Y. 2007). "Federal law identifies a non-exhaustive list of six factors that courts 'may consider' when determining whether a mark is likely to cause dilution by blurring." *Tiffany*, 600 F.3d at 111.

Atari summarily claims that the first four elements are "beyond dispute" and that the fifth element is satisfied under both the blurring and tarnishment standards. According to Atari, Printify's conduct constitutes blurring because it "runs the risk that Atari Trademarks will lose their ability to serve as a unique identifier" and "disparages the Atari Mark's reputation." (ECF No. 25 at 21.) Similarly, Atari claims that the conduct constitutes tarnishment because Printify is using the marks on goods of lesser quality. However, these general and conclusory claims are insufficient to warrant a preliminary injunction. Atari does not analyze the six-factor test for blurring. Regarding tarnishment, there is not a scintilla of evidence that the goods are, in fact, of lesser quality. Moreover, the U.S. Court of Appeals for the Second Circuit has indicated that trademark dilution claims require a defendant to be acting as a "seller." *See Tiffany*, 600 F.3d at 112 ("[I]nsofar as eBay did not itself sell the goods at issue, it did not itself engage in dilution."). *See also Nike, Inc. v. B&H Customs Servs.*, 565 F. Supp. 3d 498, 514 (S.D.N.Y. 2021) (transportation of counterfeit goods, as opposed to selling them, was not sufficient for dilution). As set forth above, Atari has not demonstrated that it is likely to succeed in showing that Printify is a seller. Accordingly, Atari has not demonstrated a likelihood of success on the merits of its trademark dilution claim.

### ii. False Designation of Origin and Unfair Competition

The standards for false designation of origin claims under 15 U.S.C. § 1125(a) and for unfair competition claims in New York overlap with the standards applicable to a direct trademark infringement claim. *See Spin Master Ltd. v. Alan Yuan's Store*, 325 F. Supp. 3d 413, 423-424 (S.D.N.Y. 2018); *Disney Enters., Inc. v. Sarelli*, 322 F. Supp. 3d 413, 430 (S.D.N.Y. 2018). Therefore, because Atari has failed to show a likelihood of success on its trademark infringement claim, it has also failed to show a likelihood of success on these two additional claims.

### 4. Claims against Janis Berdigans

"Under the Lanham Act, a corporate officer may be held personally liable for trademark infringement and unfair competition if the officer is a moving, active

conscious force behind [the defendant corporation's] infringement." *Cartier v. Aaron Faber, Inc.*, 512 F. Supp. 2d 165, 170 (S.D.N.Y. 2007) (internal quotation marks omitted).

Because the Court did not find a likelihood of success on Atari's infringement claim against Printify, the Court does not find that Atari's claim against Berdigans is likely to succeed either. Moreover, Atari's wholly conclusory claims regarding Berdigans are insufficient to show he was a "moving, active conscious force" behind the alleged infringement. *See Coty Inc. v. Cosmopolitan Cosms. Inc.*, 432 F. Supp. 3d 345, 353 (S.D.N.Y. 2020) (dismissing claims against CEO and President upon finding the complaint "offers only a conclusory statement with respect to each individual officer's involvement in the alleged acts"). Atari does not point to any specific actions of Berdigans that demonstrate his active involvement with the infringement. Just as in *Coty*, Atari's motion "is silent as to any specific actions 'authorized' by [Berdigans], stating only that [he] control[s] the acts of [Printify] and [is] directly responsible for or ha[s] otherwise orchestrated the acts of trademark infringement." *Id*.

### C.  Atari Has Not Shown a Likelihood of Irreparable Harm

The second preliminary injunction factor is whether plaintiff is likely to suffer irreparable harm in the absence of an injunction.

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). "To satisfy the irreparable harm requirement, [p]laintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (per curiam) (internal quotation marks omitted). "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Moore v. Consol. Edison Co. of N.Y.*, 409 F.3d 506, 510 (2d Cir. 2005). Under the Trademark Modernization Act of 2020, a plaintiff "shall be entitled to a rebuttable presumption of irreparable harm . . . upon a finding of likelihood of success on the merits for a violation identified in this subsection in the case of a motion for a preliminary injunction." 15 U.S.C. § 1116.

"It is well-settled that a trademark owner's loss of goodwill and ability to control its reputation constitutes irreparable harm sufficient to satisfy the preliminary injunction standard." *New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F.

Supp. 2d 305, 325 (S.D.N.Y. 2010) (citing cases) (internal citations omitted). But plaintiffs "must do more than assert that confusion itself will irreparably injure them, and conclusory statements of loss of reputation and goodwill constitute an insufficient basis for a finding of irreparable harm." *Two Hands IP LLC v. Two Hands Am., Inc.*, 563 F. Supp. 3d 290, 301 (S.D.N.Y. 2021) (internal quotation marks and citations omitted). *See also UMG Recordings, Inc. v. OpenDeal Inc.*, 2022 U.S. Dist. LEXIS 117998, at *25 (S.D.N.Y. July 5, 2022) ("UMG offers only conclusory statements of loss of reputation, which will not justify an irreparable harm finding.") (internal quotation marks omitted).

Because Atari has not shown a likelihood of success on the merits, it is not entitled to a presumption of irreparable harm. Absent this presumption, Atari has not presented enough evidence to meet its burden under the preliminary injunction standard. Atari contends that its irreparable harm consists of "diminished goodwill and brand confidence, reputational damage, loss of exclusivity, and loss of future sales." (ECF No. 25 at 25.) Atari's evidence of this harm consists entirely of a few conclusory paragraphs in the declaration of Ted Biderman, Atari's General Counsel. (Decl. of Ted Biderman, ECF No. 27 ¶¶ 22-26.) There is no evidence whatsoever in this record that the actual infringing goods are inferior in quality relative to Atari's products and there is no evidence that any consumer has been confused as to the origin of his or her purchases.

### III. Conclusion

Atari has failed to show that the "extraordinary and drastic remedy" of a preliminary injunction is warranted. *Sussman*, 488 F.3d at 139. Specifically, Atari has shown neither that it is likely to succeed on the merits nor that it will suffer irreparable harm absent the preliminary injunction. For those reasons, the Court denies Atari's motion for a preliminary injunction.

Dated: New York, New York
January 25, 2023

SO ORDERED:

*Sidney H. Stein*

Sidney H. Stein, U.S.D.J.